## AUGUSTA TAYLOR et al. v. GRAND AVENUE RAILWAY COMPANY, Appellant.

### Division One, December 22, 1904.

1. **NEGLIGENCE: Charge: Proof: Variance: Flagman.** Plaintiff, a passenger on a street railway, was injured as a result of the collision of cars on intersecting tracks, which neither could cross without a signal from a flagman, and the petition charged that "said collision was caused by the negligence of the flagman who failed to give the respective employees in charge of the said cars such signals as would have enabled them to have avoided said collision." Appellant contends that this petition charges an omission of the flagman to give any signal, and, hence, the proof being that he gave a signal but gave a wrong one, there is a fatal variance between the *allegata* and *probata*. *Held*, on the contrary, that the petition charges, in a negative form, that the flagman gave a signal, but gave a wrong one, and that being the proof, a demurrer could not be sustained on the ground that there was a fatal variance between the allegations and proof.

2. ———: **Connection With Injury: Conclusion of Expert.** There is an essential difference between permitting a witness to give an opinion and permitting him to draw a conclusion. It is error to permit the expert witness to testify that he attributes plaintiff's present condition to the injury. It is competent to state to such experts the nature and extent of the injuries, and then to ask them whether or not in their opinion such injuries would result in her present condition. But where the whole defense is that plaintiff is not paralyzed at all, or if now paralyzed the paralysis is the result of some other cause, it is error to permit the expert witnesses to say that they attribute her present paralysis to the injuries received at the time of the accident, for that is a fact to be determined by the jury and is the real issue in the case.

3. **EXCESSIVE VERDICT: Duty of Courts.** It is as clearly the duty of the Supreme Court, under its superintending control over all other courts, and under its final responsibility in all cases to see that justice is properly administered, to set aside a verdict and judgment and award a new trial, or to enter such judgment as the trial court should have entered, wherever the verdict and judgment are manifestly wrong or shock the judicial sense of right, as it is its duty to let verdicts and judgments stand where they are manifestly for the right party or where the errors committed in the course of the trial did not injuriously affect the losing party or the merits of the case. This power and duty are inherent in the court outside of the statute.

4. ———: **$7,000: On Former Trial $1,250: Unsatisfactory Evidence.** Where on a former trial plaintiff recovered judgment for $1,250, and on this eight years later $7,000, which was by the court reduced to $5,500, and where all the expert witnesses at the first trial found no paralysis or any other troubles except nervous ones, and at this some of the expert witnesses said her trouble was profound hysteria or due to opium eating, and others that it was paralysis which began six years after the accident, the ends of justice will be best subserved by having the case tried over again.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates.* Judge.

REVERSED AND REMANDED.

*John H. Lucas* for appellant.

(1)   The court erred in admitting incompetent evidence, namely, that of Dr. McDonald and Dr. Jones,

questions that were solely for the jury, and not a matter of expert evidence. Koenig v. Railroad, 173 Mo. 698; Graney v. Railroad, 157 Mo. 682; Langston v. Railroad, 147 Mo. 465; Gutridge v. Railroad, 94 Mo. 472; Beattger v. Railroad, 136 Mo. 536; Koons v. Railroad, 65 Mo. 597; Eubank v. Edina, 88 Mo. 655; Gravisk v. Railroad, 49 Mo. 276; Benjamin v. Railroad, 50 Mo. App. 610; Rogers, Expert Ev. (2 Ed.), sec. 53; Brown v. Mitchell, 31 S. W. 627; Railroad v. Sheldon, 51 Pa. 809; Jones v. Portland, 50 N. W. 737; Briggs v. Railroad, 53 N. W. 1020; Jones v. Railroad, 16 L. R. A. 442. (2) The verdict of the jury was excessive, and the forced remittitur did not relieve from the effect of the same. Haynes v. Trenton, 108 Mo. 123; Stoetzele v. Swearinger, 90 Mo. App. 588. (3) The court erred in overruling the demurrer to the evidence of plaintiff, and in refusing to give the peremptory instructions requested by defendant. Raming v. Railroad, 157 Mo. 506; Gurley v. Railroad, 93 Mo. 449; Chitty v. Railroad, 148 Mo. 765; Bohn v. Railroad, 106 Mo. 433; DeBolt v. Railroad, 123 Mo. 504. (4) The court erred in giving instructions asked by plaintiff, and refusing those asked by defendant. Raming v. Railroad, 157 Mo. 506; Gurley v. Railroad, 93 Mo. 449; Railroad v. Dawley, 50 Mo. App. 480; Hester v. Fidelity & Casualty Co., 69 Mo. App. 186; Dry Goods Co. v. Schooley, 66 Mo. App. 417; O'Rourke v. Railroad, 142 Mo. 350.

*L. H. Waters* for respondents.

(1) The court did not err in permitting Dr. McDonald and Dr. Jones to answer the questions complained of. Rogers on Expert Tes. (2 Ed.), 65; Greenleaf on Ev., sec. 440; Donnelly v. Railroad, 70 Minn. 278; McLain v. Railroad, 116 N. Y. 468; Stouter v.

Railroad, 127 N. Y. 661; Flaherty v. Powers, 167 Mass. 61; City of Decatur v. Fisher, 63 Ill. 241; Railroad v. Laws, 61 S. W. 498; Smiley v. Railroad, 160 Mo. 639; Denver v. Railroad, 100 Fed. 738; Roark v. Greene, 61 Kan. 299; Railroad v. Holsopple, 12 Ind. App. 306; Crouse v. Railroad, 102 Wis. 204; Chatsworth v. Rowe, 166 Ill. 114; McKeon v. Railroad, 94 Wis. 483; Bowen v. Railroad, 89 Hun 594; State v. Privitt, 175 Mo. 225. Objections to their testimony were too general. Longan v. Weltmer, 79 S. W. 65. (2) The court did not err in refusing appellant's demurrer to the evidence. The petition alleges: ''That the collision was the result of and caused by the negligence of said watchman, who then and there failed and neglected to give the respective employees in charge of said cars as they approached said crossing such warning and signals as would have then and there enabled said employees by the use of ordinary caution on their part to have avoided said collision.'' There was an ordinance requiring the two companies to put a watchman at that junction. On the same evidence under the same petition this court practically held that plaintiffs were entitled to recover. Taylor v. Railroad, 137 Mo. 368. The watchman failed to give ''such warning and signal'' as was required of him under the duty imposed upon him, and his omission to discharge that duty, whether by failing to give any warning or signal, or by giving an improper signal, was negligence. Wharton, Neg., sec. 2. Negligence includes every omission to perform a duty imposed by law. Shearman & Redfield, Neg., sec. 2. Negligence is but an omission of duty. Railroad v. Munger, 5 Denio 267. The duty of the watchman was to prevent a collision. This duty he failed to perform by not giving ''such warning or signals as would have prevented the collision.'' If he gave the wrong signal or failed to give any he failed to give such warning or signal as would have prevented the collision. He failed to discharge his duty. (3) A

verdict for $5,500 under the evidence in the case was not excessive. The doctors differed, as they always do, and the jury preferred to rely on the evidence of those who had attended upon Mrs. Taylor for from one to eight years, rather than those who saw her but a few minutes. Dr. Perkins, appellant's doctor, saw her but once and was unable to account for her condition. He thought that it was a case of feigned paralysis, although he stuck pins in her limb and swore he could not tell whether they hurt her except from what she said. The jury saw the plaintiff while on the witness stand and heard the medical witnesses and found for plaintiffs, and gave her a verdict for $7,000. The court required us to remit $1,500, and it was done.

MARSHALL, J.—This is an action for ten thousand dollars damages for personal injuries alleged to have been received by the plaintiff, Augusta Taylor, on September 27, 1892, by reason of a collision, at Fifth and Walnut streets, in Kansas City, between a cable car of the defendant, and an electric car of the Northeast Street Railway Company.

This is the second appeal in the case. Originally the suit was against both the defendant, the Grand Avenue Railway Company, and the Northeast·Street Railway Company. The case was first tried on June 2, 1893, and resulted in a verdict for the defendant, the Grand Avenue Railway Company, and against the Northeast Street Railway Company for twelve hundred and fifty dollars. The plaintiff and the Northeast Street Railway Company filed motions for new trial. The trial court sustained said motions, and the defendant, the Grand Avenue Railway Company, appealed to this court, where the judgment was affirmed. [137 Mo. 363.]

A second trial was had in the circuit court on January 3, 1901, when the plaintiff dismissed the case as to the Northeast Street Railway Company, and a ver-

dict was rendered against the defendant, the Grand Avenue Railway Company, for seven thousand dollars. The trial court ordered a remittitur of fifteen hundred dollars, which being done, judgment was entered for fifty-five hundred dollars, and the defendant appealed to this court.

For the sake of brevity the defendant, the Grand Avenue Railway Company, will hereinafter be referred to as the Cable Company, and the Northeast Street Railway Company as the Electric Company.

The Cable and Electric companies are street railroad companies and operate lines of street cars in Kansas City, each having double tracks, which intersect at Fifth and Walnut streets. Under an ordinance of the city, said companies are required to and do maintain a common flagman at said intersection, each company paying one-half of the hire of said flagman, and the trains of the two companies are moved, at the said intersection, upon signals from the flagman. The grade of Fifth street at said intersection is level, while the grade of Walnut street on both sides of Fifth street slopes sharply toward the north. By reason of these facts, the custom of operating the trains of the two companies at said intersection was, and is, that the cable cars going north on the east side of Walnut street have the right-of-way over the electric cars, while the electric cars have the right-of-way over the cable cars going south on the west side of Walnut street, but all cars cross the intersection as aforesaid only upon signals of the flagman.

On the day of the accident, September 27, 1892, about five o'clock p. m., the plaintiff was a passenger, for hire, on the electric car, going west on Fifth street. When the electric car reached the said intersection a cable car was just crossing the intersection going north. The uncontradicted evidence is that the flagman was standing in the center of the two streets, and that he first gave a signal to the cable car coming south on

Walnut street to come on, and then immediately gave a like signal to the electric car on Fifth street going west. Both cars proceeded to obey the signal, when the flagman at once raised both hands, as a signal for both cars to stop. But it was too late, and before the cars could be stopped the cars collided. The motorman of the electric car applied the brakes and reversed the current, but despite all efforts, the electric car struck the cable car on its side less than one-third of its length from its front. The controlling rod on the electric car was bent, the wire cable for reversing the current was broken, and the front wheels of the electric car were thrown about six inches off the track and towards the north, although no glasses in the windows or doors of the electric car were broken. The only injury to the cable car was to tear off a board on the outside of the car. The electric car was a small, light car, and with twenty-two passengers on it was crowded, all the seats being taken and persons standing in the aisles and on the front and rear platforms.

The plaintiff says that the electric car did not check up when approaching the intersection, but "was running like lightning"—faster than she ever knew it to run.

Edward Moon, a witness for the plaintiff, said he was riding on the front platform of the electric car, and that he did not notice any checking of the speed of the car as it approached the intersection. On the other hand, James W. Vickers, the motorman on the electric car, who was also a witness for the plaintiff, said that when he approached the intersection he checked the speed of the electric car, so that when he reached a point forty or fifty feet from the intersection the car was almost at a standstill, and that after the cable car going north had passed the intersection the flagman gave him the signal to come on, so he applied the power and proceeded and when within fifteen or twenty feet of the intersection he saw the cable car

going south, also approaching; that he had not seen the cable car going south any sooner, because the cable car going north, that had just passed the intersection, obstructed his view.

F. W. McDonald, the general manager of the Electric Company, who was a witness for the plaintiff, testified that he was standing on the rear platform of the electric car with his back towards the front of the car, and that the electric car was brought almost, if not entirely, to a standstill when it approached the intersection; that it then started forward, and that the impact of the collision was so slight that he could scarcely feel the shock at all, and that it only threw his back slightly against the back of the car.

The plaintiff testified that she was seated on the north side of the electric car in the third seat from the front; that she saw the cable car approaching and saw that there would be a collision; that she raised partly from her seat and exclaimed, "Oh," and that the collision then occurred and she was thrown on the "bias," and fell on the floor of the car, striking her left side as she fell against a seat or the stove on the other side of the car; that she got up and was thrown down backwards a second time on the floor of the car, and rendered insensible; that she don't know how she got out of the car, but that when she recovered her senses she was taken to her home in a carriage. She says no bones were broken; that there were no visible marks of any bruises on her body except on her lower limbs; that her side was sore; that she suffers constant pain in her back, in the back of her head, in her temples, in her left side; that she spits blood; that her lower limbs seem numb; that she has severe cramps in her toes and cannot use them; that "I have to drag my left limb and my right limb goes down kind of like it was sleeping."

She further said on the second trial that she was confined to her bed from the time she was hurt on September 27, 1892, *for one year.* Whereas, on the first

trial had on June 2, 1893, she testified that she was confined to her bed from September 27th to the following New Year's day. Moreover, on the second trial she testified that she moved her residence about March, 1893, and again in June, 1893, and the record shows that she was present in court and testified on the first trial which was on June 2, 1893. Again she testified on the second trial that Dr. Park McDonald came to see her every day for one year after she was hurt, and afterwards came four or five times a week. Whereas, Dr. McDonald says he went to see her every day for two or three months after she was hurt, and after that he went two or three times a week for the next two years, and after that he could not say how often he went.

Touching the nature and extent of her injuries the testimony is most extraordinary. On the first trial of the case on June 2, 1893, Dr. McDonald said that there were no bones broken, no bruises apparent, only a slight abrasion on the outside of the lower part of her left leg, and a red spot on her forehead which did not amount to a break of the skin; she complained of pain in her back and in her head; that he prescribed opiates to relieve the pain and general tonics to build up her system; that he advised her to take exercise, but she said she could not walk or put her feet to the floor; that there was no paralysis or indications of paralysis, but that her trouble was "purely nervous." Whereas, on the second trial of the case on January 3, 1901, he testified that he did not know what he had testified to on the first trial, and when his testimony then was called to his attention, he refused to say whether or not he had so testified. He testified, however, on the second trial of the case, that she then had indications of paralysis. He then testified as follows: "Q. When did you first discover any indication, as you thought, of paralysis? A. Well, I don't know, Colonel; there was quite a while there I tried to get her to exercise herself and she could not do it, and I found there was

a loss in moving around, she could not handle herself, and that was some time before I called Dr. Jones in the case. Q. I understand you to say some two or three years? A. Yes, I don't know just how long it was. Q. You spoke of giving her an opiate, the twentieth of a grain of opium? A. I gave her a combination neuralgic pill containing a twentieth grain of opium, belladonna and hyoscyamus."

Dr. J. B. Jones, a witness for the plaintiff, who was. called in by Dr. McDonald, testified that he first saw the plaintiff in February, 1900, and had seen her five or six times since; that Dr. McDonald had been consulting him about the case for two or three months before he was called in; that when he first saw her she was sitting in a chair; that he had her husband and Dr. McDonald help her to walk across the room and saw that her trouble in locomotion was largely in her left limb; that he then examined her for the "knee jerk," that is, he had her cross her knee and tapped her on the tendon below the knee to see what the reaction would be, with the result that in the left knee he got what is called the "exaggerated jerk," while the right knee was natural, but a little slow; that he then examined her for the "sensibility part," which consisted of sticking a pin in her, with the result that it showed more sensibility in her left limb than in the right; then he applied the reflex arm test, with the result that the reflex was somewhat less in the left arm than in the right; that he then applied the reflex eye test, which consists of closing one eye and keeping the other open, and then pinching or sticking a pin in the neck below the chin, and if the pupil of the eye is natural, it will dilate, or if the patient is required to look at a distant object and you suddenly slip your finger in front of the eye, the pupil will dilate, and the result was "that the pupilary reaction was not there." He then tried the electric test, and found that in the muscles of the left arm, and left lower-leg the reaction was less than in the right. He

further said that there may be paralysis of sensibility in one part of the body and paralysis of motion in another part of the body or they may be combined; "for instance, in locomotor ataxia, the trouble with the patient is that he is not paralyzed, but he don't know where his feet are, he simply sweeps them around and holds them far apart as a matter of security; makes a broad base for himself, for he don't know exactly where his feet are unless he sees them." He further said he made an examination of a scar on the left side, which she told him was an abscess that came on subsequent to the injury and found "quite a destruction of the tissue under the skin there, and that there was an adhesion there, probably there is what we call an adipose tissue, a kind of padding between the skin and the muscles, and I found that there was some absorption of the bone, and that this adipose tissue had invaded the entire right bone on that side. I found that the left leg was perceptibly larger than the right," which he said was unusual except in persons who are left-handed; that "she seemed to be dull and talked with a considerable amount of trouble, and she seemed to be easily excited." He concluded by saying she had "hemiplegia," which means paralysis of one half of the body.

On the other hand, Dr. J. W. Perkins, a witness for the defendant, said that he examined her on the Sunday before the second trial, and "found her suffering from a combination of hysteria and what I judged to be a drugged condition. She is either a morphine eater, or cocaine, or is in the habit of taking some drug, I should judge by her appearance during that time, her apathetic condition when I was there that might have possibly been due altogether to the hysterical condition, but I think not." He further said: "Q. What would you say about her being paralyzed? A. She certainly was not paralyzed so far as movement was concerned in any way, because she moved her limbs in every direction and put them just where I asked her to, and she

got up and walked for me, and her arms and limbs moved perfectly in response to her will." He further said he tried her whole left side as to sensibility by sticking a pin in her, and she denied that she felt it. "Of course, I had to take her word for it, and that condition being so general all over her body, not accompanied with any paralysis of motion in any way and accompanied by this drowsy, apathetic condition, I judged it to be due to a drug effect, or to hysteria, or to both;" that he considered "the hysterical element is the large one in the case;" that no one knows the cause of hysterics, but "it is due to the general nervous make-up of the individual."

Touching the scar on her neck, he said: "Well, I found some scars on her neck which were said to have been the result of abscesses, following this accident which, from the apearance, I believe to be tubercular scars coming from tuberculosis. They were not of very great extent. They were worm-eaten—had a scarred worm appearance. They were irregularly contracted and had the appearance of tubercular lesion." He further said that he had learned from Dr. Jones that she was paralyzed; that paralysis caused by an injury is called "traumatic paralysis," and always follows immediately upon the injury. He then testified as follows: "Q. Now, doctor, say again what you found the matter with that woman? A. I think she is a hysteric. Q. She has hysterics? A. Of a profound type. Q. What is hysteria? A. That, I have already stated, I cannot say. It is a functional nervous disorder without a pathological basis, which arises in women as a result of some diseased process, either from the ovaries or the uterus, or sometimes in the brain as a result of certain brain conditions." He further said that hysteria will not-produce paralysis, but that what is called "hysterical paralysis," "is always a feigned paralysis;" that hysteria may result in monomania, and sometimes in epilepsy. In conclusion he was asked

his best judgment about what was the matter with the plaintiff and he said: "I do not think there is a thing of a traumatic nature the matter with this woman; the functional trouble or hysterical condition may have been entirely due to some preceding history she gave me of a miscarriage and so on; that, I think, in the best of my opinion, had a good deal more to do with her present condition than any accident."

Dr. W. C. Bedford, a witness for the Electric Company, said he examined the plaintiff on the afternoon of the day following the accident, and that he found several bruises on the outside of the left leg and on the forehead, but that the skin was not even broken; that she complained of pain in her chest; that he did not think it possible for the bruises she had to cause any great suffering or injury to plaintiff.

Dr. N. J. Pettijohn, a witness for the Electric Company, said he examined the plaintiff ten days or two weeks after the injury, and once after that time; that he found no bones broken, no skin broken, and no visible injury whatever; that she complained of pain in her head and in her side, but that there were no physical manifestations of pain; that he found no bruises on her; that if she had had any bruises they had all disappeared.

The plaintiff was called in rebuttal and testified as follows: "Q. This mark on your shoulder Dr. Perkins looked at and tried to account for, will you tell the jury what that is? A. Yes. Q. What is it? A. It is a birth-mark. Q. Has it been there ever since you were a little child? A. Ever since I was born. Q. Did you ever have any sore or hurt there at all? A. No, sir."

So as to connect the alleged paralysis with the accident, the plaintiff asked Dr. McDonald: "Q. To what did you, and do you now attribute her condition?" The defendant objected to the question as incompetent and calling for a conclusion, and not a matter of expert

testimony. · The court overruled the objection, and defendant saved an exception, and the witness answered: "A. To her injury at the time she was hurt." The defendant then asked the court to exclude the answer for the same reason, the court denied the request and. the defendant saved an exception.

For the same purpose the plaintiff asked Dr. Jones: "Q. Now, I will get you to state, doctor, if you heard the testimony of Mrs. Taylor as to the manner of her injury, and as to her condition from the time of the injury until the present time. A. I did. Q. I will ask you if you heard the testimony of Dr. McDonald as to the condition of Mrs. Taylor at the . time he was called on the night of the injury and at various times that he visited her since, in the past eight years? A. I did. Q. Now, doctor, from all the testimony, and your examination of her on the four or five occasions within the last twelve months, please state to the jury what was probably the cause of her condition as you found it?" The defendant objected to the question as not a proper hypothetical question, as incompetent, and not a proper matter for expert testimony. The court overruled the objection, the defendant saved an exception, and the witness answered: "A. The injury received on the street car."

At the close of the plaintiff's case and at the close of the whole case the defendant demurred to the evidence, the court overruled the demurrers and the defendant excepted. The trial resulted as hereinbefore stated, and the defendant appealed.

The defendant assigns three errors, to-wit: First, error in admitting the testimony of Drs. McDonald and Jones, above set out, connecting the alleged paralysis with the accident; second, that the verdict is excessive; and, third, the overruling of the demurrers to the evidence. For reasons that will hereinafter appear, the third error assigned will be considered first.

## I.

The third error assigned is the overruling of the demurrers to the evidence.

The point of this contention is that the plaintiff not only wholly failed to prove the specific negligence alleged, but that the evidence adduced disproved the existence of the negligence alleged.

The petition alleges that the Cable and Electric companies maintained a watchman at the intersection of Walnut and Fifth streets, "whose duty it was then and there to signal the employees of the defendants in charge of the cars of the defendants as the said cars approached the said crossing of the said tracks at the intersection of said Walnut and Fifth streets, and thereby inform said employees, when the cars under their control might or should cross over the said crossing and thereby prevent the cars of the defendants from colliding at said crossing." The petition then alleges that plaintiff was a passenger on the electric car, and was injured by the collision aforesaid. It then alleges: "That said collision was the result of and was caused by the negligence of the said switchman, who then and there failed and neglected to give the respective employees in charge of the said cars, as they approached said crossing, such warning and signals as would have then and there enabled said employees, by the use of ordinary care and caution on their part, to have avoided said collision; and by the negligence of the employees of said defendants in charge of said cars which collided as aforesaid, in running, managing and conducting the said cars under their respective control in a negligent manner."

Now, the gravamen of the contention is that the petition charges a failure of the switchman, at the crossing, to give the motorman and gripman a warning or signal that it was safe to cross the tracks of the other road, whereas the proof is that the switchman,

or flagman, as he is hereinbefore called, did give a signal to both cars to come on, in consequence of which the collision occurred. Or otherwise stated, that the negligence charged is an omission of the flagman to give any signal, while the proof is that he gave a signal but gave a wrong signal, that is, he signaled both cars to come on at the same time.

The principle of law invoked by the defendant is well settled in this State. [Gurley v. Railroad, 93 Mo. 445; Waldhier v. Railroad, 71 Mo. 514; Bohn v. Railroad, 106 Mo. 433; Hite v. Railroad, 130 Mo. 132; Chitty v. Railroad, 148 Mo. l. c. 74; Raming v. Railroad, 157 Mo. 477.] The reason underlying the rule is that such cases do not show a mere variance between the *allegata* and *probata,* but they amount to a total failure of proof.

But the case at bar does not fall within that principle of law. Here the petition does not charge simply an omission of the flagman to give any signal, but the petition charges the negligence of the flagman to be that he failed and neglected to give "*such* warning and signals as would have then and there enabled said employees" (the gripman on the cable car and the motorman on the electric car) "by the use of ordinary care and caution on their part to have avoided said collision." (The remaining charge of the petition as to the negligence of the operatives of said cars was withdrawn from the jury at the request of the defendant, so need not be considered here.)

Thus the petition charges that the flagman gave a signal but gave a wrong signal. The petition charges this in a negative form, and while it is not as clear and perspicuous as it would have been if the pleader had adopted the positive and direct form of expression, nevertheless the effect is the same. So read, there is neither a variance nor a total failure of proof in the case, and therefore this case does not fall within the principles of law announced in the cases cited.

There was no error in the ruling of the trial court upon the demurrers to the evidence.

## II.

The first error assigned is the ruling of the court in permitting Drs. McDonald and Jones to testify, as above set out, connecting the alleged paralysis with the accident.

The sole contention of the defendant at this trial was that the plaintiff is not paralyzed at all or at any rate that if she was paralyzed at the date of the second trial of this case, on January 3, 1901, it was the result of some other cause than the accident, for traumatic paralysis always follows soon after the injury and the plaintiff did not show any indications of paralysis for about six years after the accident; that the plaintiff was not injured to any appreciable degree by the accident, but that she is a profound hysteric, and that such condition arises from other and natural causes, and it is in no manner attributable to the accident.

This being the sole defense in the case, it is too clear to admit of serious argument that it was error to permit the medical experts to testify as above set out. For by so doing the court permitted the experts to decide the whole case, to adjudge the sole defense of the defendant against it, and to draw a conclusion of fact which it was the province of the jury to decide. As was well said by BLACK, J., of a similar ruling in Gutridge v. Railroad, 94 Mo. l. c. 472, "The witness was allowed to testify to the very thing which the jurors were called upon to determine from the facts, not from the opinion of this or any other witness. His opinion practically ruled the whole case, if believed. It was substituting his opinion for the judgment of the jurors."

Or, as was pointedly stated by BRACE, J., in Boettger v. Iron Co., 136 Mo. 536, "He was permitted to testify to all the facts within his knowledge, touching the question of the deceased's experience in re-

spect to the subject of inquiry, but it would have been improper to have permitted him to go further and give his own opinion upon those facts. This was the province of the jury. These facts did not call for the opinion of an expert, but for a verdict. [Gutridge v. Railroad, 94 Mo. 468.]''

In Langston v. Railroad, 147 Mo. 465, in speaking of the ruling of the trial court permitting the defendant's manager to state that the motorman was a competent man, one of the issues being as to his competency, WILLIAMS, J., pertinently said:

''The purpose of this evidence was of course to rebut the charge of negligence made in the pleadings, and which plaintiff's testimony tended to support, and to show that it was improbable that the car was suddenly jerked forward by any improper action of said motorman. If his incompetency was to be passed upon by the jury, they should have been furnished with facts upon that subject, and not the mere opinion of the witness. . . . The witness did not confine himself to the facts but was permitted to venture his own opinion that the motorman was fully qualified, and this went to the jury with the endorsement of the court, that it was proper evidence for their consideration in reaching a verdict in the case.''

It would have been proper to state to the plaintiff's experts the nature and extent of the injuries received by the plaintiff as they appeared at the time of the accident, and then to ask them whether or not in their opinon such injuries might, could or would result in paralysis. The experts having thus given an opinion, it would have been for the jury to find the fact as to whether in this particular case the paralysis was caused as the plaintiff's experts said it might have been caused, or whether it was the result of other causes, as the defendant's experts testified might be the case.

To the trained legal mind there is a very essential difference between permitting an expert to give an

opinion and permitting him to draw a conclusion. The one is the province of a witness—the other is, in the first instance, the special prerogative of the jury.

And when a witness is thus permitted by the court to invade the province of the jury, it goes to the jury with the endorsement of the court, and is calculated to make the jury believe that it was proper for the witness to find the fact instead of the jury doing so.

The ruling of the court upon the admission of this testimony was therefore erroneous.

## III.

The second error assigned is that the verdict is excessive.

The determination of this question involves a consideration of the facts and testimony in the case. The uncontradicted evidence is that before the accident the plaintiff, in the opinion of persons who were not experts, was a sound, stout and apparently healthy person, about twenty-six years old, married, but with no children, and according to her statement to Dr. Perkins she had had a miscarriage.

In consequence of the collision while she was getting up from her seat on the car, she was thrown upon the floor of the car, striking her left side against a seat or stove on the opposite side of the car while falling, and after regaining her feet, was thrown down upon the floor of the car a second time. No bones were broken. The skin was not broken. She had an abrasion or bruise on the outer part of her lower left limb and a red spot on her forehead. She complained of pain in her back and in her head. There were no physical manifestations of pain nor of any serious injury, and ten days after the accident there were no visible bruises. She was taken home in a carriage and went to bed. According to her testimony on the first trial, which occurred nine months and five days after the in-

jury, she was confined to her bed from September 27, 1892, to New Year's, 1893, and according to her testimony on the second trial, which occurred eight years three months and six days after the accident, she was confined to her bed for a whole year after the accident. Yet according to her testimony on the second trial she moved her residence in March, 1893, and again in June, 1893, and the record shows she was present in court and testified upon the first trial of the case on June 2, 1893, and all three of these incidents occurred during the period of the one year after the accident when she now says she was confined to her bed. According to her testimony, the doctor visited her every day for a year after the accident, and thereafter visited her four or five times a week. According to the doctor, he visited her every day for two or three months after the accident, and thereafter occasionally, he would not say how often. According to the testimony of her attending physician, given upon the first trial, there were no serious or visible injuries sustained by her, there was no paralysis or indication of paralysis, but her condition was purely nervous. He prescribed opiates for the pain she complained of and general tonics and advised exercise, but she said she could not move. According to the testimony of the attending physician, given over eight years after the accident, he could not remember what he testified to upon the first trial, but said that "there is a certain amount of paralysis now," which he first discovered indications of about six years after the accident. The other doctor who was a witness for the plaintiff, first examined her in February, 1900, which was seven years and ten months after the accident, and had examined her five or six times since, said she had paralysis of motion on the left side of her body and paralysis of sensibility on the right side of her body. He also testified about a scar on her neck, which he said she told him was caused by an abscess that followed after the accident, and he described very learn-

edly the effects thereof upon the skin, muscles and bones of the neck, and the presence of adipose tissue and of adhesion. Dr. Perkins, a witness for the defendant, also testified as to that scar, and diagnosed it as "tubercular lesion." But the plaintiff in rebuttal testified that it was merely a birth-mark which she had had all of her life, and that she had never had a sore or hurt on her neck.

On the other hand, Dr. Bedford, a witness for the Electric Company, who examined the plaintiff the day after the accident, testified that he found only a slight bruise that did not break the skin, on the outside of her lower left leg and a red spot on her forehead, which he said could not possibly produce paralysis or any serious injury.

Dr. Pettijohn, another witness for the Electric Company, examined her ten days or two weeks after the accident and found no visible injuries or bruises whatever.

Dr. Perkins, a witness for the defendant, examined her the Sunday before the second trial, which occurred on January 3, 1901, and found no injuries or bruises and no paralysis whatever. He diagnosed her case as a combination of hysteria and a drugged condition; said she denied feeling a pin that he stuck in her left side, but testified that he attributed that to the effects of hysteria or of drugs, and said that while she claimed to have no feeling in her left side, he did not think it was due to paralysis, because it was not accompanied with any paralysis of motion whatever, for she could move her left arm and leg wherever she pleased, and at his request she got up and walked. He also said that paralysis from the accident could not have resulted so long after the accident, because traumatic paralysis —that is, paralysis that results from an injury—always follows immediately upon the injury. He pronounced her case hysteria of a profound type, and said hysteria could not produce true paralysis, but that what is called

"hysterical paralysis" is "always a feigned paralysis."

Now the question of whether or not the plaintiff has paralysis, or any other ailment, or no ailment at all, and whether or not if she has anything the matter with her, it is a result of the injury, or is attributable to other causes, is one for the jury. However unreasonable it may appear to the mind of the layman, that paralysis, or any serious trouble, could ensue from a bruise on the left leg and a red spot on the forehead that disappeared entirely within ten days after the accident, and became discoverable for the first time to an attending physician only after six years' attendance upon the case, it is a question of fact for the jury, and this court never interferes unless the verdict is such as to show passion, prejudice or misconduct of the jury, or is such as to shock a judicial sense of right and justice. This, however, is a question of practice, and is not a prerogative denied to this court by the organic law. On the contrary, it is just as clearly the duty of this court, under its superintending control of all lower courts, and under its final responsibility in all cases to see that justice is properly administered, to set aside a verdict and judgment and award a new trial, or to enter such judgment as the trial court should have entered, wherever the verdict and judgment are manifestly wrong or shock a judicial sense of right, as it is its duty to let verdicts and judgments stand where they are manifestly for the right party and where the errors committed in the course of the trial did not injuriously affect the losing party, or the merits of the case. [R. S. 1899, sec. 865.] And this power and duty is inherent in the court, outside of the statute, for the statute is simply expressive and declaratory of the first principles of the administration of right and human justice.

Doctors are invaluable to suffering mankind and when the strongest of us, or our loved ones, are sick, we naturally seek their aid from our own sense of help-

lessness, and their very presence is often a comfort and assurance to us, notwithstanding we know they cannot always cure us. But even doctors are human, and the testimony of the five doctors in this case shows that doctors do not always agree and that necessarily some of them must be mistaken. For instance, in this case, based upon information from the plaintiff that the scar on her neck was caused from an abscess that followed the injury, one medical expert found a padding of adipose tissue between the skin and the muscles, with an adhesion, and a decay of the bone, while another found that it was a case of "tubercular lesion." While the plaintiff herself, without denying that she so informed the doctors, said it was only a birth-mark, and that she had never had a sore or hurt on her neck. One expert said there could be paralysis of motion without paralysis of sensibility on one side of the body, with paralysis of sensibility without paralysis of motion on the other side of the body, or there might be a combination of both, and that the plaintiff had paralysis of motion on the left side of her body and had paralysis of sensibility on the other, while the other expert said she had no paralysis on either side of her body, because she had complete power of motion on both sides, and that her claim that she could not feel a pin stuck in the left side of her body was not due to paralysis, but to hysteria, or some drug she was taking, or to both. One said she had paralysis or "a certain amount of paralysis" on the left side of her body, and that it was caused by the accident, and first manifested itself some six years after the accident, while another said she had no paralysis or indication of paralysis, and that if she had, it could not have been caused by the injuries received in this case, or by any injury that was received six years before it first made itself manifest, because traumatic paralysis always followed immediately upon the injury, but that she had a profound type of hysteria, and that hysteria could not produce paralysis, but

Taylor v. Railroad.

what is called hysterical paralysis is always a feigned paralysis. The same expert who now says "there is a certain amount of paralysis now," testified seven years ago, and nine months after the accident, that she had no paralysis, and no indications of paralysis, but that her trouble was purely nervous.

Upon such evidence as this the jury returned a verdict for seven thousand dollars, which the trial court ordered reduced to fifty-five hundred dollars. The circumstances and testimony are such that it is impossible to escape a very strong conviction that the ends of justice will be best subserved by having the case tried over again. The verdict of the first jury was for twelve hundred and fifty dollars, while that of the second jury was for seven thousand dollars. Of course there can be no mathematical scale or hard-and-fast rule for measuring damages in such cases, but where two juries have differed so radically in the same case, it shows that even juries may not always administer even-handed justice, and where there is such a wide difference between the opinions of the experts, and where they all admit that for years after the alleged injuries were received there were no visible evidences or manifestations of any injury whatever, the conclusion is irresistible that a verdict for seven thousand dollars or even for fifty-five hundred dollars is so excessive that it ought not to be allowed to stand.

For these reasons the judgment is reversed and the cause remanded for trial anew.

All concur. except *Robinson, J.,* absent.