## LENA PORTER, Respondent, v. ELLERY M. HETHERINGTON, Appellant.

### Kansas City Court of Appeals, June 30, 1913.

1. **NEGLIGENCE: Automobiles: Care Required: Instructions.**
   Under the statute the care required of a driver of an automobile
   is the highest degree of care of a very careful person, and
   the evidence showed negligence on the part of the driver in
   this case.

2. ————: ————: **Instructions.** When the answer sets up con-
   tributory negligence it is not error to instruct in behalf of
   plaintiff that the burden is on defendant to prove that issue.

3. ————: ————: ————. Where there was evidence of a
   number of injuries and that one of them showed indications
   of being permanent in nature, it was not error to instruct
   the jury that in making up their assessment of damages, if
   any, they could take into consideration the various injuries,
   if any, and also the fact that any of them were permanent,
   if they found any were permanent.

4. ————: ————: ————. Where there are no obstructions
   to prevent a chauffeur of an automobile from seeing persons
   in the street ahead of him, and the uncontradicted evidence
   is that he saw them in the street in time to have stopped
   before striking them, and there is no evidence that they sud-
   denly and unexpectedly went in front of the automobile,
   it is not necessary to submit to the jury the question of the
   reasonableness of time the chauffeur had to stop the auto-
   mobile.

5. ————: ————: ————: **Hypothetical Questions.** Where
   the facts as to the happening of the injury and the condition
   claimed to have resulted therefrom are not controverted and
   are few in number and the evidence clear, it is permissible

to ask the expert who has heard all the testimony his opinion as to whether a certain condition could have been caused by a certain blow, and in doing so to refer the expert to the testimony without recapitulating the facts and including them in the question. It is error, however, when the facts are in any manner disputed or are too voluminous to be easily comprehended and remembered.

6. **DAMAGES: Personal Injuries: Evidence.** If a physician from his own observation, or a superficial examination of a patient can detect evidences of an internal injury, he can testify that in his opinion such injury existed at the time. He cannot testify, however, if his opinion is derived wholly from what his patient told him.

7. ————: ————: **Evidence: Question to Experts.** Whether questions put to experts as to whether a certain condition could in their opinion have been caused by a certain accident are hypothetical questions or not, and even though it should be in the discretion of the court to allow the questions to be answered in the form in which they were couched, that discretion should be exercised the same way on both sides of the case.

8. ————: ————: **Expert Witness.** In addition to allowing an expert witness to give his opinion as to whether a certain diseased condition of the womb could have been caused by a certain accident, he should be allowed to give the grounds or reasons of his opinion. In this case plaintiff was shown to have suffered no hemorrhage and the defendant offered to show by his expert witness that, in his opinion, a blow sufficient to have caused the condition of the womb complained of would have also necessarily caused injury to, and hemorrhage from, the other pelvic organs, but the offer was refused. It should have been admitted, since it would appeal far more strongly to practical men than a mere conclusion of a scientific man.

## Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas*, Judge.

REVERSED AND REMANDED.

*McCune, Harding, Brown & Murphy* for appellant.

(1) The court erred by permitting Doctor Harrington to answer hypothetical questions, which contained elements which should have been excluded,

and omitted elements which should have been included. Marshall v. McKelvy, 55 Mo. App. 245; Mammerberg. v. Street Railway, 62 Mo. App. 567; Russ v. Railroad, 112 Mo. 48; Heinzle v. Railroad, 182 Mo. 555; Root v. Railroad, 195 Mo. 377; Turner v. Haar, 114 Mo. 345; Holloway v. Kansas City, 184 Mo. 19; Goss v. Railroad, 50 Mo. App. 621; Thomas v. Street Railway, 125 Mo. App. 131; Root v. Railroad, 195 Mo. App. 377; Benjamin v. Street Railway, 50 Mo. App. 50; Riley v. Sparks, 52 Mo. App. 575; Smart v. Kansas City, 91 Mo. App. 592 Senn v. Railroad, 108 Mo. App. 150. (2) The court committed error by permitting Doctor Barber to answer an improper hypothetical question. The question propounded to him contained improper elements and omitted necessary elements. See authorities under above paragraph. (3) The court improperly sustained an objection to the hypothetical question asked Doctor Hetherington, based upon the testimony of plaintiff's statement as to the accident and Doctor Harrington's testimony as to the injury. The evidence was simple, direct, free from contradiction and conflict and not susceptible of two constructions. Feed v. Railroad, 129 Mo. App. 504-5-6; State v. Privett, 175 Mo. 227; Smart v. Kansas City, 208 Mo. 162.

*John C. Nipp* and *John L. Wheeler* for respondent.

(1) The court did not err by giving instruction 4 for plaintiff. Sec. 8523, R. S. 1909; Nichols v. Kelley, 159 Mo. App. 20; Bongner v. Ziegenhein, 165 Mo. App. 329. (2) The court did not err by permitting Doctor Harrington to answer hypothetical questions. Same authorities cited by appellant; Longan v. Weltner, 180 Mo. 322; Rosenheim v. Young, 33 Mo. 230; State v. Young, 153 Mo. 445; State v. Wright, 134 Mo. 417; Bragg v. Street Railway, 192 Mo. 345.

TRIMBLE, J.—This suit is for personal injuries sustained by reason of being knocked down and rolled over by an automobile driven by defendant's negro chauffeur who was taking the automobile home pursuant to defendant's commands.

Plaintiff and her sister were walking home on the right hand side of Grand avenue going south and had reached a point between Twenty-fifth and Twenty-sixth street where the sidewalk ended close to a rock crusher. When the two ladies reached the end of the sidewalk, they stepped out into the street, which was paved with asphalt, and, keeping near the west curb, continued on their way south. Just after stepping from the wayside, to avoid the dirt or dusty path where the sidewalk did not exist, the ladies looked back up the avenue and saw defendant's automobile coming, but it was out in the center of the street, and as they were near the west curb, there was no danger whatever from it, so they proceeded on their way south. There was a space of twenty-four feet between this west curb and the west street car track. At the time the ladies looked behind them, the automobile was perhaps 150 feet away and apparently in the middle of the street; and between the ladies and the west rail of the street car track was a space of at least twenty feet. In a moment the automobile, without warning or noise of any kind, swerved out to the curb and struck the ladies, knocking them down and rolling them over on the pavement until the automobile struck the curb, ran up over it and against a trolley pole, and stopped. The first the ladies knew of the car being out from the center of the street and upon them was when it struck them. When the automobile stopped against the pole it was headed in a southwest direction.

The rubber tire of the left front wheel was off. During the day it had been taken off, owing to a puncture, and the wheel was "riding on the rim,"

that is, the metal flange on the felloe of the wheel was resting on the asphalt and, as the weather was warm, this was a little soft, and the rim was sinking into the asphalt making a mark and rendering the machine somewhat more difficult to guide properly. The steering gear was also worn. The defendant had ordered the chauffeur to take the machine home in that condition. The chauffeur, as he struck the pole, was screaming, "He had no business sending me out with this machine, it was in no condition to be on the street." And immediately after striking the pole said, "If I hadn't run into that pole I would be going yet."

The next day after the injury the defendant went with his chauffeur to the place where the collision occurred and had the details of the accident related to him. Afterwards, in talking to the mother of plaintiff, defendant said, speaking of his automobile, "I have owned it for eight years and never had an accident with it. It is very easily controlled. I could stop it within five feet. He (meaning the chauffeur) must have lost his head." The accident occurred on June 3, 1911, and on the 13th of June, when the chauffeur's month was up, the defendant refused to pay him, giving as his reason for refusing, that it was his fault that caused the trouble with the ladies.

It was in evidence by the chauffeur that the automobile was not going over five miles an hour; and there were no obstructions between the automobile and the plaintiff to prevent the chauffeur from seeing and warning her. That, at that rate, the car could have been stopped in five feet. The negligence charged was that the servant in charge of the vehicle failed and neglected to use the highest degree of care that a very careful person would use under like or similar circumstances in that there was a failure and neglect to warn plaintiff of the approach of said car, or to

stop said car after he saw or could have seen plaintiff's danger; that he operated said motor vehicle with the machinery thereof in a defective condition making it difficult to control said car; that he failed to keep a lookout for pedestrians and turned said car out of its course and ran it against plaintiff. The answer was a general denial and a plea of contributory neglegence. The jury returned a verdict for $900 in favor of plaintiff. Defendant appealed.

Complaint is made of plaintiff's instruction No. 4, but we are unable to see any merit in the objections thereto. It did not assume any fact at all much less a fact in dispute. Nor was it objectionable because it ignored the question of the reasonableness of the time in which the chauffeur could have warned plaintiff or stopped the car. The chauffeur swore he was going up grade, not over five miles an hour and could have stopped in *five* feet. Later on he testified that he saw the women when they stepped from the sidewalk into the street and that they started *across* the street, that he turned to the left but a street car coming from behind caused him and the women to turn towards the right; that when he saw the women in front of his car they were twenty feet away and he attempted to pass them by going between them and the curb and in doing so struck them. In other words, he saw the women in front of him still going south but going diagonally down the street and approaching the curb and, although he could have stopped the car in five feet and allowed the women to reach the curb in safety, he attempted to pass them on the right by going between and the curb and in doing so struck them. Consequently, by his own admission, he saw them in a reasonably sufficient time to have warned them or to have stopped his machine before striking them. He says he did warn them, but admits he did not stop. Plaintiff says he neither warned her nor stopped, and, on appeal, we must accept that

evidence which most strongly supports the verdict. So that it was not necessary to include in said instruction the question of whether he saw them in a reasonably sufficient time to have given warning or to have stopped or both, in order to avoid striking them. His testimony, when studied and analyzed and all reasonable inferences drawn therefrom, justifies the belief that there was ground for thinking the chauffeur "lost his head" and also that the tireless wheel, sinking into the pavement with its unprotected metal rim, may have helped to bring about the collision, since it made the machine harder to steer. The mischief originated, however, when the chauffeur, instead of stopping, tried to pass the women on the right. He tried to pass on the left and then tried the right, according to his own testimony, and never once tried the expedient of stopping, which he should have done, if he had been exercising the "highest degree of care of a very careful person" required by section 8523, Revised Statute 1909. These observations answer the objection that instruction No. 4 should have contained the words "by the exercise of due care" after the words "could have seen plaintiff," since, even if they are ordinarily required, they were not necessary here where the chauffeur admits he actually saw plaintiff in plenty of time to have stopped before striking her. Nor was the instruction erroneous in submitting to the jury the alleged failure on the part of the chauffeur to look out for pedestrians since there was evidence that there were no obstructions on the street and the automobile was plainly seen out in the center of the street 150 feet away and that, as it approached plaintiff from behind, it curved out toward the side until it struck her. The instruction merely told the jury that if they find the chauffeur, while acting as a servant of defendant and in the scope of his employment, failed and neglected to use the highest degree of care that a very careful person

would use under like or similar circumstances in doing the various acts submitted, and that as a direct result thereof plaintiff was injured, then plaintiff could recover provided the jury further found that she was exercising ordinary care for her safety. This was proper. [R. S. Mo. 1909, sec. 8523; Bongner v. Zeigenheim, Jr., 165 Mo. App. 328.]

Plaintiff's instruction No. 5 is not open to objection. It merely told the jury that "it is averred by the defendant in his answer that any injuries that the plaintiff received at the time and place in question were received because of her own negligence at the time, which directly contributed thereto" and that the burden was on defendant to prove "such contributory negligence." We are unable to see anything wrong with it. Defendant certainly did set up the defense in his answer.

The sixth instruction is likewise unobjectionable. It did not tell the jury that plaintiff's injuries, or any of them, were permanent, but that if the jury found there were injuries they should take them into consideration, and, if any were permanent, the jury could take that into consideration in arriving at their assessment of damages. This was not telling the jury to guess at the permanency of any or all of said injuries, but only that, if any injury was believed by the jury to be permanent, they could take the fact of such permanency into consideration. There was sufficient testimony as to the permanency of the injury to the womb to justify the submission to the jury of the question of permanency, although the evidence as to permanence was not altogether free of doubt.

There was no error in admitting the testimony of Dr. Harrington that he thought her womb was injured at the time he first examined her. He was not allowed to tell what the patient told him. That was excluded. And while he testified that he made no local examination, his testimony as a whole shows

that by that he meant an internal examination, and that his conclusion that her womb was injured was based on the examination and observation of her that he did make and not solely on what she told him. There was no other internal injury found or complained of, and at the time of the trial and before that when Dr. Harrington and afterwards Dr. Barber did make an examination, the womb was found to be retroverted, congested and certain parts of it enlarged; and it was shown that this condition of the womb would produce the symptoms observable in the plaintiff. The substance of Dr. Harrington's testimony was that at first he made no actual examination of the womb itself but from his examination and observation of her, he thought there was "some deep internal injury" and thought it was her womb. It is true the petition claimed only one internal injury, viz., to the womb, but as the other evidence showed no other internal injury but that, and did show that, we cannot see how the admission of Dr. Harrington's reference to "some deep internal injury" could be prejudicial. If that were all the testimony relied on to prove an injured womb, then it might be too much in the nature of speculation, but it was not offered to show that the womb was injured but rather to prove that the injured condition of the womb had manifested itself at that time and hence did not proceed from some other cause arising after the accident. There was no testimony that Dr. Harrington based his opinion on what his patient told him as was in the case of Holloway v. Kansas City, 184 Mo. 19, l. c. 31.

Plaintiff's expert witnesses were allowed, over defendant's objections, to state that in their opinion the impaired condition of the plaintiff's womb could have been caused by being struck and rolled over by an automobile. When, however, defendant's experts were asked questions bearing upon whether the collision could have caused the injured or diseased

condition of the womb, they were not allowed to answer. And this brings us to the only serious question in this case.

Before going into this question let us bear in mind the issues before the jury. The plaintiff was claiming that among her injuries was one to her womb; and the evidence showed that the only injured condition likely to be permanent was that of the womb. The evidence also showed that the plaintiff was struck on the back and hip. There was no bruise or apparent injury to the abdomen, nor was there any hemorrhage from any of the pelvic organs. And plaintiff's experts had been asked whether the condition of the womb could have been caused by an automobile striking plaintiff in the back, throwing her to the pavement and rolling her over. And both of plaintiff's experts had answered that it could. One of them had expressed a little doubt as to whether a stroke on the back would necessarily cause it, but that the general accident, shock, contusion, concussion and so on might do it. But, on being asked whether or not the condition of the womb could have been caused by being struck by an automobile and being rolled by the automobile on the pavement, he said he thought it could. In the questions asked by plaintiff there was no statement of the facts, circumstances or conditions under which the accident occurred or the force with which she was struck, simply whether or not the striking of plaintiff in the back, throwing her to the ground and rolling her on the pavement by an automobile could cause the impaired condition of the womb. Defendant objected to these questions because these elements were not included in the questions, and for other reasons, but the objections were overruled, and the plaintiff's experts were allowed to answer. In this state of the evidence one of defendant's expert witnesses (defendant himself who was a physician of twenty-five years' experi-

ence) was asked whether or not the accident as described by plaintiff could have caused the condition of the womb as described by plaintiff's witness, Dr. Harrington. (It was proved that the doctor had heard all the evidence.) He attempted to answer that it could not, but, on objection from plaintiff, he was not allowed to answer and the answer given was stricken out. The ground of plaintiff's objection was that the question did not contain the proper elements showing the facts, circumstances and conditions under which the collision occurred. But this is precisely what the plaintiff's questions lacked, and to which defendant objected, but without avail. In fact, defendant's questions did not leave out the elements of the attendant circumstances because it included those facts by referring to the collision as "the accident *as described by plaintiff*" and to the condition of the womb "as shown by Dr. Harrington" who was plaintiff's expert. In other words, instead of doing as plaintiff did, asking simply whether the womb condition could have been caused by an automobile striking plaintiff in the back, throwing her down and rolling her over (without regard to the circumstances or force of the collision), defendant adopted plaintiff's story as to the collision and its attendant circumstances, and was asked as an expert whether that kind of a collision could have caused the impaired condition of the womb, which plaintiff's witness said she had. But even when plaintiff's own testimony and that of other witness was adopted on the matter, defendant's experts were not allowed to answer. Plaintiff now contends that the vice of defendant's questions to his experts lies in the fact that they merely referred the expert to the evidence as a basis for his opinion instead of reciting the assumed facts themselves so that the jury could see what the expert had as a basis for his opinion. It is true, that, if the facts are *controverted*, it is improper

to refer the expert to the testimony of the witness
for the basis of his opinion because the jury have no
way of knowing on what testimony or view of the
evidence the expert is basing his opinion, and hence
this gives them no opportunity to properly weigh
and judge his testimony; and it puts the expert in the
place of the jury because it leaves it to him to say
what testimony is true.   But where there is no dis-
pute as to the fact of the collision and its character,
(as was the case here) it is not improper to refer the
expert to the evidence given for plaintiff and her
witnesses as a basis for his opinion.   As to this dis-
tinction between cases where there is a conflict in the
testimony and where there is not, see Rogers on Expert
Testimony (2 Ed.), 70, 71; State v. Privitt, 175 Mo.
207, l. c. 227; Feed, etc., Co. v. Railroad, 129 Mo.
App. 498, l. c. 506; Smart v. Kansas City, 208 Mo.
162, l. c. 201, 202.   In Rodgers on Expert Testimony,
p. 71, it is said that "even in cases where more than
one witness has testified, if there is no conflict in the
evidence, and if the testimony is not voluminous"
a court may in its discretion allow a question to be
put to the expert without recapitulating the evidence.
And in Feed Co. v. Railroad, supra, 506, it is held
that, "In those instances where there is no substantial
ground to suppose that different persons could have
more than one view as to the evidence which the
jury has heard, or that any one could give it more
than one interpretation, it is allowable to ask the
expert's opinion on the evidence he has heard, for in
such instances the jury may be said to know upon what
his opinion is based.   And so the Supreme Court,
in the case just cited (State v. Privitt), stated the rule
to be (italics ours) that "when, in a proper case for
expert testimony, the facts are *admitted*, or proved
by evidence which is not *conflicting*, the opinion of an
expert upon such facts is admissible as a scientific

deduction." In a case formerly decided by that court, it was said that, "If the expert has been present in court, and has heard all the evidence, and there is no dispute about the facts, he may then be asked his opinion about the whole matter." [State v. Klinger, 46 Mo. 224.] The case of Livery Co. v. Railway, 105 Mo. App. 556, in the St. Louis Court of Appeals was where the facts were controverted."

Plaintiff contends that the questions put by her to her experts were not hypothetical questions and hence did not have to include the necessary elements that the question to Doctor Hetherington did. It would seem that if plaintiff's questions were not hypothetical neither were defendant's. We are inclined to think they were all of the same character, simply questions put to experts as to whether or not the collision could have caused the impaired condition of the womb. If it be urged that it is within the discretion of the court as to whether an expert can be referred to the testimony instead of recapitulating the facts, the answer is that such discretion should not be exercised one way on plaintiff's side and the contrary way on defendant's.

Another expert witness, Dr. Ayres, who was appointed by the court to make a personal examination of the plaintiff and who was offered by defendant, testified as to the condition in which he found her womb, and that two causes could produce the condition he found, namely, that a percentage of women are born that way, and inflammation of the womb and of the organs about the womb could in course of time produce it. The defendant then attempted to show by him his opinion as to whether the condition he found was the result of, either of said two causes or the result of a blow or injury, but an objection on the part of plaintiff was sustained. Defendant then asked the witness what kind of a blow it would require to cause the result he found in plaintiff. An objection

to this was sustained.  He was then asked whether
or not a blow, which would cause the condition he
found, would be followed by a hemorrhage, and an
objection to this was also sustained.  We think the
objections to the last two inquiries above were im-
properly sustained.  The first was very likely proper,
since, in the form in which it was couched it may have
enabled the witness to usurp the function of the jury,
But the question of the nature, force and extent of
a blow that would be sufficient to produce a certain
condition of an internal organ like the womb, would
seem to be a proper inquiry to make of an expert;
and also whether or not, owing to the situation of the
womb and the protection afforded by the pelvic bones,
a blow sufficient to cause the condition he found
would not so rupture and injure the other organs
and adjacent tissue as to cause a hemorrhage.  It
was shown that there had been no hemorrhage.  In
view of this fact, the defendant was entitled to show
by his expert that, in his opinion, if a blow or an injury
had caused the condition he found, it would have
produced hemorrhage, a symptom that was absent
at the time of and after the collision.  The only per-
manent injury plaintiff claimed to have was that
to her womb.  It is an internal organ not subject to
ordinary inspection, liable to impairment from a
variety of causes even in those who have never been
in an accident.  Whether the collision caused its
impaired condition was a very important issue, and
defendant was entitled to lay before the jury the
opinion of his experts, not only as to the nature and
force of the blow sufficient to cause that impaired
condition, but also what symptoms would be likely
to manifest themselves if a blow or an injury did
cause it.  The jury were entitled to have the benefit
of this testimony in order to properly pass on the
question of the nature and extent of the injuries in-
flicted on plaintiff.  It is true this particular witness,

Dr. Ayres, was finally permitted to say whether or not the collision could have caused the condition, but this was not sufficient to cure the exclusion of the other questions. The answer to this last question was nothing more than a statement by Dr. Ayres that he did not see how it could have produced the condition. But the other questions, if they had been allowed an answer, would have given plain and cogent grounds or reasons why the collision ought not to be considered the cause, reasons that would have appealed far more strongly to the common sense of practical jurors than would the mere opinion, conclusion or *ipse dixit* of the expert.

For these reasons we are of the opinion that error was committed and that a new trial should be granted. That plaintiff was struck by the automobile through the negligence of defendant's negro chauffeur and is entitled to damage was undoubtedly shown. The extent to which she was injured, however, is a matter which the defendant has as much right to have fairly litigated as the question of liability, since it governs the amount which he should be called on to pay. Inasmuch as the case is to be retried, it may be well for us to state that, under the facts as presented, there was no error in refusing defendant's instructions 9, 10, 11 and 12. Reversed and remanded. All concur.