NINA PATTERSON, Respondent, v. SPRINGFIELD TRACTION COMPANY, Appellant.

Springfield Court of Appeals. March 5, 1914.

1. **PLEADING: Amending Petition: Departure.** An amendment to a petition that while plaintiff was on defendant's electric car as a passenger the said car jumped the track "by reason of the carelessness and negligence of defendant, its agents, servants and employees" was properly allowed.

2. **PLEADING: Oral Objections to Petition: Reaches What.** Raising an objection to a petition by oral objection to the introduction of evidence is not regarded with favor for any purpose and does not go to the defects in a former petition or the propriety of an amendment thereof.

Patterson v. Traction Co.

3. **WITNESSES: Expert Witnesses: Nature of Evidence.** The credibility of a medical expert, as of any other witness, is a matter for the jury and the evidence of such expert is purely advisory based on his superior knowledge, training and experience and being in the nature of an opinion based on facts assumed to be true for the purpose of eleciting such opinion.

4. **INSTRUCTIONS: Evidence of Expert: Truth of facts on Which Based.** It is proper to instruct the jury that before the opinion of an expert has any value whatever the jury must first find that the facts on which such opinion is based are true.

5. **WITNESSES: Expert Witnesses: Basis of Testimony.** An expert witness may give an opinion based on a state of facts which he himself has witnessed, or which are detailed to him by other witnesses, or which are put to him in the form of a hypothetical case.

6. **WITNESSES: Expert Witnesses: Scope of Testimony.** Evidence of an expert witness that a certain kind of an accident was likely to cause the conditions and results found, is not objectionable.

7. **WITNESSES: Expert: Improper Evidence.** It is incompetent for an expert witness to say that the plaintiff's condition was, in his opinion, the result of a certain alleged injury.

8. **EVIDENCE: Competency: Opinion.** Evidence of plaintiff that she was not able to work continuously after the accident and that she had to give up her position because of such inability, was not incompetent on the ground that it was an opinion and conclusion.

9. **PERSONAL INJURIES: Damages for: What Recoverable.** In personal injury cases the person injured may include in the damages sued for not only the amount which she has already incurred the liability to pay for medical or surgical treatment, but also the reasonable expense of such future treatment as may be reasonably necessary in consequence of the injury.

10. **PERSONAL INJURIES: Damages: Future Medical Attention: Proof of.** Though future medical treatment for injuries received and the cost thereof are necessarily speculative and uncertain, proof thereof, in as definite a way as possible, is permissible.

11. **STREET RAILWAYS: Personal Injuries: Proximate Cause: Evidence.** In an action against a street railway for injuries caused by the derailment of one of defendant's cars, evidence considered sufficient to proximately connect the injuries with the accident.

12. **PLEADING AND PROOF:** Negligence: General: Specific: Proof. Where a petition charged general and not specific negligence, plaintiff is not confined in his proof to any one particular act of negligence.

13. **CARRIERS:** Negligence: Petition: Proof: Prima Facie Case. Where the relation of carrier and passenger exists, it is sufficient to allege that defendant's car was derailed by reason of defendant's negligence and that plaintiff was injured thereby. And when plaintiff shows the derailment and attendant circumstances, he establishes a case of negligence and the burden shifts to the defendant to show that it was not guilty of negligence.

14. **STREET RAILWAYS:** Operation of Cars: Degree of Care Required. A street railway in the operation of its cars is held to the highest degree of care and in case of derailment from which injuries result it can only excuse itself by showing that the accident was occasioned by an inevitable cause which human foresight could not have prevented.

15. **STREET RAILWAYS:** Negligence: Injuries to Passengers: Proof. Where general negligence is alleged, although the burden is not on the plaintiff to show any defect or negligence occasioning the derailment of a car by which she was injured, she may show specific defects or negligence, and by so doing she is not deprived of the presumption of negligence in her favor.

16. **INJURIES:** Unmarried Woman: Right of Action. In an action against a street railway company for personal injuries, where plaintiff was shown to be working for wages and her suit was for loss of time in earning a livelihood and the instructions allowed her to recover only for "loss of earning capacity" whether or not plaintiff was an unmarried woman was immaterial.

17. **DAMAGES:** Medical Expenses: Need not have been Actually Paid. It is not necessary that medical expenses incurred on account of personal injuries shall have been actually paid to allow recovery therefor; it is sufficient that a legal liability has been incurred and insolvency of the plaintiff is no defense.

18. **DAMAGES:** Personal Injuries: Health of Injured Person Prior to Accident. Not a Mitigation of Damages. That the health and physicial condition of a passenger injured by a street car derailment was such that the shock produced greater injury to her than if she had been in robust health, is not a defense nor ground for reducing the damages.

19. **VERDICT:** Excessiveness of. Verdict for $2,500 on account of injuries occasioned by the derailment of a street car upheld upon a review of the evidence, no passion or prejudice appearing in the award. (Farrington, J. dissenting),

Appeal from Greene County Circuit Court.—*Hon.
Arch. A. Johnson,* Judge.

AFFIRMED.

*Delaney & Delaney* for appellant.

(1) The court erred in admitting the evidence
of the cost, doctor's bills, hospital and medicine bills,
of an operation of curatement. Dunnevant v. Mock-
sond, 122 Mo. App. 428; Haas v. Railroad, 111 Mo.
App. 706; Waddell v. Met. Ry. Co., 113 Mo. App.
680; Caplin v. Transit Co., 114 Mo. App. 256; Halley
v. Light Co., 115 Mo. App. 652; Wilbur v. Electric Co.,
110 Mo. App. 689; Deland v. Cameron, 112 Mo. App.
704; Steinmann v. Transit Co., 116 Mo. App. 673. (2)
The opinion of an expert stands or falls with the sup-
porting facts. Therefore no opinion is properly ad-
missible unless all the facts upon which such opinion
is predicated is submitted to the jury. Otherwise the
one giving the opinion usurps the function of the jury.
Smith v. Tel. Co., 113 Mo. App. 429; Bragg v. Railway,
192 Mo. 331; Glasgow v. Railway, 191 Mo. 347-358;
Spaulding v. City of Edina, 122 Mo. App. 65-69. (3)
A general charge of negligence (even if any is made,
which we question) yields to the specific charge which
is clearly made—negligent operation of the car. Jo-
seph v. Railway, 129 Mo. 603; Thompson v. Livery
Co., 214 Mo. 487; Orcutt v. Bldg. Co., 201 Mo. 424-
441. (4) The burden was upon plaintiff to show that
the condition of which she complained was caused by
the force of the derailment. If this be left to conject-
ure the plaintiff fails. Especially is this so when the
derailment is trifling and the story of plaintiff so un-
reasonable as is shown by this record. De Maet v.
Fidelity Co., 121 Mo. App. 104-106. (5) It is error,
to permit a physician, examined as an expert, to draw
conclusions from the facts in the case as to what caused
plaintiff's condition, where even his testimony discloses

(as it does in this case) the fact that the same condition might result from various causes. Glasgow v. Railway, 191 Mo. 347-358; Spaulding v. City of Edina, 122 Mo. App. 65-69. (6) To recover for doctor's bills, where it is not alleged that they are actually paid, plaintiff must allege specifically that she is liable therefor. The proof shows the contrary and the allegations of the petition show that she is not liable, but is insolvent. Nelson v. Railway, 113 Mo. App. 662. (7) The damages are excessive and the award is clearly the result of bias and prejudice.

*Williams* and *Galt* for respondent.

(1) The petition was amendable, and defendant cannot complain of the amendment. Rawson v. Railroad, 129 Mo. App. 613; Prash v. Railroad, 151 Mo. App. 415; 29 Cyc. 567-569. (2) The evidence as to reasonable cost of the surgical operation of curettement was admissible after the fact was established that curettement was the only method for the relief of the condition of plaintiff produced by the accident, and for the further reason that this evidence supports the allegation in plaintiff's petition that she will "in the future be compelled to expend large sums for the necessary treatment of her said injuries." Sotebier v. Transit Co., 203 Mo. 702; Ballard v. Kansas City, 110 Mo. App. 395; Wilbur v. Railroad, 110 Mo. App. 697. (3) The questions asked of plaintiff's medical experts were not purely hypothetical but were based upon facts within their knowledge, developed by personal examination, which facts they had just detailed to the jury, and they were called upon to, and did express their opinions, that the conditions found could result, naturally and directly, from the accident described. This was withn the prescribed legal limits of expert testimony. Brown v. Huffard, 69 Mo. 305; Wilbur v. Railroad, 110 Mo. App. 697; Reilley v. Sparks, 52 Mo. App. 574; Benjamin v. Railway, 50 Mo. App. 608; Holloway

v. Kansas City, 184 Mo. 39; Jones v. Traction Co., 137 Mo. App. 416.   (4) Defendant's instruction XI, refused, is based on the false assumption that the record shows plaintiff to be a married woman—whereas it shows she is a single person, and dependent upon her own earnings for her livelihood.   The instruction refers to loss of earning capacity and not loss of services.   The earnings of a married woman belong to her and not to her husband.   Nelson v. Railroad, 113 Mo. App. 659; Snickles v. St. Joseph, 155 Mo. App. 308.   (5) The judgment is for the right party and the award of damages is not excessive under the evidence.   Kennedy v. Railroad, 36 Mo. 351; Merrill v. St. Louis, 12 Mo. App. 469; Loftis v. Kansas City, 156 Mo. App. 687; Morrell v. Lawrence, 203 Mo. 363; Choquette v. Railroad, 152 Mo. 266; Fisher v. St. Louis, 189 Mo. 579; Edwards v. Railroad, 82 Mo. App. 485.

STURGIS, J.—This is a suit for personal injuries received by plaintiff by reason of the derailment of one of defendant's electric cars on which plaintiff was a passenger.   The suit was brought to the January term, 1913, of the circuit court, at which term the plaintiff, of her own motion and by leave of court, made an amendment of her petition.   The gist of the amended petition is that while plaintiff was on defendant's electric car as a passenger, "the said car jumped the track *by reason of the carelessness and negligence of the defendant, its agents, servants and employees,* and plaintiff was thereupon and thereby violently thrown out of her seat and received serious and permanent personal injuries," describing the same, her suffering, treatment, expenses, etc.   The words in italics show the amendment.   The defendant then filed its answer, a general denial.   The defendant also asked and obtained a continuance to the next term of court because of the amendment, presumably on the ground of raising new issues.   The case went to trial at the

next term and defendant objected *ore tenus* to the introduction of any evidence for the reason that the original petition failed to state a cause of action and the amended petition constitutes in law a departure. The overruling of this objection constitutes the first assigned error.

In the first place we have no hesitation in holding that this was a proper amendment, even if objection had been made and exception saved in a proper manner. The amendment did not change the cause of action. In the next place, raising an objection to the petition by oral objection to the introduction of evidence is not regarded with favor for any purpose and certainly goes no further than to raise objection to the petition then before the court and not to the defects in a former petition or the propriety of an amendment thereof.

The suit is for $5,000 and on a trial by jury plaintiff recovered $2500. The second objection relates to the admissibility of evidence. All the evidence shows that the front wheels or truck left the rails, dropped to the ground between the ties causing the car to come to a sudden stop. The witnesses differ much as to the rate of speed and the violence of the stop. The plaintiff's evidence is that the stop was so violent as to throw her forward against the next seat and to the floor, causing visible marks and swelling on her side near the hip and on her leg. She was transferred to another car and made no complaint at the time, though she says it pained her but she did not know the extent of her injuries. She also says that she told the conductor on the car to which she was transferred of the accident but that conductor says it was the next day after the accident that she told him and that she did not then claim to be injured. She says she went on to her work as ticket seller at an amusement park and tried for some days to do her usual work, so as to hold her position, but that a month or so later she was compelled

to quit as her injuries developed.  She consulted a
physician, Dr. Dorrell, the next morning after the acci-
dent, who then made an examination of her.  He says,
in short, that he found the womb anteverted, i. e.,
thrown forward, and one ovary prolapsed and dropped
down.  He also said he had examined her a short time
before the accident and these conditions did not exist;
that these female organs were then in a normal condi-
tion.  The occasion of his previous examination was
that she was complaining of headaches and he made the
examination to determine whether her headaches was
caused by any derangement of the female organs and
found that it was not.  Dr. Dorrell continued to treat
her for some time after the accident and examined her
shortly before this trial.  He described the progress of
plaintiff's malady by saying that this misplacement of
the female organs impaired the circulation and caused
chronic congestion therein, which brought about a con-
dition called endometritis, i. e., an inflamed and thick-
ened condition of the inside or lining of the womb.  It
was also shown that the womb became enlarged and
that there was a bloody mucous discharge.  These con-
ditions resulted in nervousness, headaches, depressed
feeling and some pain—ills designated as female trou-
bles.  As to her condition Dr. Dorrell was strongly cor-
roborated by Dr. Roseberry, who examined her some
two or three months after the accident and again short-
ly before the trial.

The important question for the jury to determine
was whether these maladies were caused by the derail-
ment of the street car in question.  On this point we
have Dr. Dorrell's evidence, as well as that of plaintiff,
that these conditions did not exist shortly before the
accident and that the probable cause of the same, to-
wit, the displacement of the female organs, did exist
shortly thereafter.

Over defendant's objection that the question com-

bined hypothetical facts with facts actually observed
and known to the witness and that it usurped the func-
tion of the jury in allowing the witness to say "whether
or not the accident *caused* or was *likely* to cause the
condition found." Dr. Dorrell was asked and an-
swered as follows: "Q. Where the evidence shows
that the patient was riding on a street car and the
street car ran off the track and jumped to the ground
with some force, and the patient was sitting on her
seat and was thrown out of her seat with considerable
force, and received a blow in the region of the thigh,
and also received a bruise on the leg, and injury to the
hip, and you say this prolapsed condition of the ovary,
and anteverted condition of the womb, could be caused
by such injuries? A. Falling forward in a street car
or anything else is always liable to bring about in a
woman an anteversion of the womb, throwing it for-
ward. It does it from the force of the body and the
coming in contact with some other body, which you can
understand, how a body can be thrown forward. The
womb is folded in the pelvis, but the connections are
not as strong as a rope. They are made up of tissues,
which allow the womb to fall forward and drop down
on acount of an unusual or out of the ordinary expe-
rience. A falling forward of the womb, causes a dis-
placement of the uterus." Also, Dr. Roseberry was
asked and answered in this manner: "Q. Suppose the
evidence showed the patient was riding in a street car
and the street car left the track and bumped down onto
the ground with some force and the patient was thrown
out of her seat and thrown forward and in such manner
as to receive a bruise on one side of her leg and bruise
on the hip and bruise in this groin, would you say that
such a falling as that could cause a prolapsed condi-
tion of the womb or the condition that you found there
the first time of the ovaries—Just describe to the jury
how that matter is in a person the evidence shows is
normal before the accident. A. An accident of that

kind might produce a disrupelment of the organs. That is, with reference to the womb, might have a prolapse, a dropping down of the womb. I found at the time of examination an anteversion, a throwing forward. Q. Could that anteversion be caused by that accident? A. Yes, it could be.''

We find no case holding that a medical expert may not testify as to the conditions of the human organism and the kind and extent of a person's injury or malady, found and observed by him on a personal examination of the patient, and also testify as an expert as to the cause of such injury or malady, based on hypothetical facts put in evidence by other witnesses. In testifying, both as an ordinary witness and as an expert, his credibility is a matter for the jury. The facts testified to by him may or may not be believed, and thereby be established to the satisfaction of the jury, just as with any other witness. His evidence as an expert is purely advisory, based on his superior knowledge, training and experience and is in the nature of an opinion based on facts assumed to be true only for the purpose of eliciting such opinion. It is perfectly proper to instruct the jury, as was done in Smith v. Telephone Co., 113 Mo. App. 429, 443, 87 S. W. 71, cited by appellant, that before the opinion of the expert has any value whatever, the jury must first find to be true the facts on which such opinion is based. The above case is an authority for and not against the proposition that the truth of the facts on which the opinion is based may rest in whole or in part on the evidence of the expert himself. In Riley v. Sparks Bros., 52 Mo. App. 572, 575, the court said: ''The rule is that an expert may give an opinion based on a state of facts which he himself has witnessed, or which are detailed to him by other witnesses, or which are put to him in the form of a hypothetical case.'' That such is the accepted rule and practice is shown by Glasgow v. Metropolitan St. R. Co., 191 Mo. 347, 358, 89 S. W. 915; Holloway v. Kansas.

City, 184 Mo. 19, 40, 82 S. W. 89; Benjamin v. Railway Co., 50 Mo. App. 602, 608; Brown v. Huffard, 69 Mo. 305; Jones v. Traction Co., 137 Mo. App. 408, 415, 118 S. W. 675; Wilbur v. Railroad Co., 110 Mo. App. 689, 697, 85 S. W. 671; Porter v. Hetherington, 172 Mo. App. 502, 513, 158 S. W. 469.

As to the contention that these hypothetical questions allowed the witness to usurp the province of the jury in stating a conclusion rather than an opinion of the witness, we think a reading of the same will show that there is nothing to support appellant's statement that the witnesses were allowed to state that the derailment of the car "was not only *sufficient* to produce but *did* produce the conditions of plaintiff." No witness so testified. They only testified that such an accident, causing plaintiff to be thrown forward against the seat and to the floor with the force and in the manner testified to, was liable to and might produce the displacement of the female organs, as found by them and which, in turn, brought about, in their opinion, her diseased condition and suffering. We think it is not objectionable for a witness to say that a certain kind of an accident was likely to cause the conditions found. The questions and answers objected to are not open to the objection of allowing the experts to decide the very issues controverted in the trial, as is held in Bragg v. Metropolitan St. Ry. Co., 192 Mo. 331, 343, 91 S. W. 527; Glasgow v. Metropolitan St. R. Co., 191 Mo. 347, 358, 89 S. W. 915; Taylor v. Railroad Co., 185 Mo. 239, 255, 84 S. W. 873; Spaulding v. City of Edina, 122 Mo. App. 65, 69, 97 S. W. 545. The correct rule is stated in the Glasgow case, supra, a case in many respects similar in its facts to this one, as follows: "It was competent for the learned witnesses to state what cause or causes might produce such a result, and this both of them did without objection, stating that such a fall could produce it and that there were many causes which would produce the same

Patterson v. Traction Co.

effect, but it was incompetent for them to say that in this case the plaintiff's condition was, in their opinion, the result of the alleged fall.'' The questions and answers objected to were properly and clearly within the rule announced in all the cases.

Appellant also claims error in allowing the plaintiff to testify that she was not able to work continuously after the accident and had to quit her position because she was not able to work; and this too after defendant had tried to show that she did in fact go on with her work as usual and therefore was able. No authority is cited in support of this contention except the statement that plaintiff was usurping the province of the jury in so testifying as to a conclusion, citing the same authorities just discussed on the question of expert evidence. As this was not expert evidence, these authorities do not help us. Such evidence is so common in cases of this character and the objection so technical, that we will pass it up by merely ruling adversely.

The doctors above mentioned further testified that the diseased conditions they found and described, and which the jury has found resulted from plaintiff's injuries, would be permanent unless relieved or cured by surgical operation. The usual operation for such malady is known as curettement, which is painful, more or less dangerous, and uncertain as to result. If this fails to cure, the only other remedy would be a surgical operation of hysterotomy or removal of the womb. Dr. Dorrell was then allowed to testify, over objection, that the usual hospital and surgical expense of curettement is about $75.00 to $80.00. The offer to show the usual expense of hysterotomy was excluded. Error is assigned as to the admission of this evidence. The objection is that it is too remote, uncertain and speculative to constitute an element of damages. We may here remark that the instructions given on the measure of damages do not authorize or direct the jury to add

anything for future medical or surgical expenses. It cannot be questioned but that in personal injury cases the person injured may include in the damages sued for, not only the amount which plaintiff has already incurred the liability to pay for medical or surgical treatment, but also the reasonable expense of such future treatment as may be reasonably necessary in consequence of the injury. [Sotebier v. Transit Co., 203 Mo. 702, 715, 102 S. W. 651; Curtis v. McNair, 173 Mo. 270, 73 S. W. 167; Ballard v. Kansas City, 110 Mo. App. 391, 395, 86 S. W. 479.] It must follow that, if such future expenses may be sued for and recovered, the same may also be proven in as definite a way as is possible, though the kinds and extent of such future treatments and the cost thereof are necessarily speculative and uncertain. In the Sotebier case, supra, the court, in speaking of this matter, said: "As to what attention she will require during her life and its probable value are matters of more or less speculation. No one can tell how long she will live, what her suffering will be or what amount of medical attention she will require. The jurors are as capable of judging of those matters as any one else could be. [See Curtis v. McNair, 173 Mo. 270.] . . . . And what we have said regarding the last objection is equally applicable to this one; but we will add that we are entirely unable to see how any witness could, with any degree of certainty, testify as to what *medical attention* she might require during the remainder of her life. No physician or expert can tell how long plaintiff will live, what her pain and suffering will be, if any; what kind and how often she will need medical treatment nor what such services would be reasonably worth in the future. The most the court can do in such cases is to call the attention of the jury to the injury, if permanent, and if the evidence shows that the character of the injuries is such that the party will probably need medical attention in the future, then tell them that they may allow such sum therefor as the

evidence and facts in the case show would be just and reasonable for such attention and services.'' It is certainly not objectionable when any particular treatment or operation is shown to be reasonably necessary to further show the probable expense thereof; in fact, such evidence renders the amount to be allowed less speculative and uncertain.

What we have said disposes of the contention that the verdict rests on no substantial evidence and that no casual connection is shown between the accident and plaintiff's afflictions. In fact, defendant's chief contention, as above noted, is that the medical witnesses were allowed to testify that the accident *did in fact cause* plaintiff's injuries instead of leaving it to the jury to so find from the evidence inclusive of the opinions that such accident might or could or was likely to do so. In Porter v. Hetherington, 172 Mo. App. 502, 158 S. W. 469, the alleged injury and cause of the same and the evidence sustaining the casual connection are similar to this case and the court held that there was a case for the jury.

The defendant sought, both in the introduction of evidence and by instructions asked, to limit plaintiff's right to recover to negligence in *operating* the car derailed. This is based on the erroneous theory that plaintiff's petition counts on allegations of specific negligence in operating the car. Defendant invokes the doctrine that, although when a passenger is injured by derailment the presumption of negligence arises and a general allegation of negligence is all that is necessary, yet, if plaintiff alleged specific negligence, the proof and recovery must be limited to such specific negligence. [McManamee v. Railroad, 135 Mo. 440, 447, 37 S. W. 119; Orcutt v. Century Bldg. Co., 201 Mo. 424, 443, 99 S. W. 1062; Thompson v. Livery Co., 214 Mo. 487, 113 S. W. 1128.] This petition, however, charges general and not specific negligence. The allegation is that the car jumped the track by reason of defendant's

negligence. The negligence alleged is not limited to operating the car any more than to the construction of the track or roadbed. [Price v. Metropolitan St. R. Co., 220 Mo. 435, 454, 119 S. W. 932.] Where the relation of carrier and passenger exists, it is sufficient to allege that the car was derailed by reason of defendant's negligence and that plaintiff was injured thereby; and plaintiff makes out a case of negligence by showing the derailment and attendant circumstances and the burden then shifts to defendant to show that there was no negligence on its part. [Orcutt v. Century Bldg. Co., 201 Mo. 424, 441-2, 99 S. W. 1062.] In such case the defendant is held to the highest degree of care and can only exculpate itself by showing that the accident was occasioned by some inevitable cause which no human foresight or precaution could have averted. [Clark v. Railroad, 127 Mo. 197, 208, 29 S. W. 1013; Lemmon v. Chanslor, 68 Mo. 340, 356; Hipsley v. Railroad, 88 Mo. 348, 352.]

It is also the law that while the burden is not on plaintiff to show any defect or negligence occasioning the derailment and she need not do so, yet, where only general negligence is alleged, it is not error, as contended here, to permit plaintiff to show specific defects or negligence; and by so doing she is not even deprived of the presumption of negligence in her favor. [Price v. Metropolitan St. R. Co., 220 Mo. 435, 456, 119 S. W. 932.]

Appellant makes a further objection that, as it was shown that plaintiff was married some ten years or more prior to the date of this accident and it was not shown by direct evidence that she was divorced or her husband dead, there is not sufficient proof of her allegation as to being a single woman. Plaintiff was referred to as "Miss" throughout the trial and Patterson is her maiden name and not that of her husband. She testified that she had been married but at the trial said she was single. As this fact was not controverted we

think this is sufficient. Moreover, this fact is not material, as plaintiff was shown to be working for wages and she sues for loss of time in "earning a livelihood," and the instructions allowed her to recover only for the "loss of earning capacity." These are proper elements of damages though plaintiff was in fact a married woman. [Nelson v. Railroad, 133 Mo. App. 659, 664, 88 S. W. 781; Snickles v. City of St. Joseph, 155 Mo. App. 308, 311, 136 S. W. 752.]

We cannot agree to appellant's suggestion that, as plaintiff had not paid but only incurred a liability for medical attention, and was insolvent and allowed to sue as a poor person, therefore she should not be allowed for a liability not enforceable against her. It is conceded that it is not necessary that such expense be actually paid, provided a legal liability has been incurred, and we rule that insolvency of the patient is no defense. [Mears Min. Co. v. Maryland Casualty Co., 162 Mo. App. 178, 185, 144 S. W. 883.]

Some other errors, most of them not borne out by the record, are complained of but they are not found sufficient to warrant a reversal.

It is strenuously insisted that the damages are excessive and we are asked to order a remittitur. This argument is partially based on the fact that it was shown that the shock causing plaintiff's injuries was not severe and not such as would ordinarily cause any or, at most, only slight injury to the average person; that the plaintiff was already frail and of delicate health and predisposed to the female maladies of which she complains. We may grant that had she been of more robust health and less susceptible to the results of this shock, she would not have received more than slight temporary injury and that the average woman passenger would not have been injured as she was. We are not, however, cited to any case holding that this is a defense in a case like this. We think there are and ought not to be any. Defendant is liable to each pas-

senger so injured for his or her particular injuries, although the health and physical condition of one passenger may be such that no serious injury results, while to another the consequences are unusually disastrous. [De Maet v. Fidelity Storage, Packing & Moving Co., 231 Mo. 615, 132 S. W. 732; Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 267, 73 S. W. 592.]

The physicians differ much as to the extent and duration of plaintiff's injuries. This trial was had about nine months after the injuries, so that the nature and extent of the same had fairly well developed. Dr. Dorrell testified that the plaintiff is suffering from endometritis; that a condition of this kind is permanent unless relieved by surgical operation of curettement; this operation might not cure; it would be painful and would require hospital treatment. Dr. Roseberry testified that the conditions as found by him would continue indefinitely; that he knew of nothing that would accomplish much outside of an operation of curettement; if curettement does not cure it might require an entire removal of the womb; she was suffering from endometritis when I examined her shortly before this trial. Dr. Ralston, a witness for defendant, who examined her shortly before the trial, said he found a slight granulation in the cervix; that the womb was slightly heavier than normal and slightly prolapsed; this inflammation of the cervix and enlargement of the womb we call endometritis; it is not a particularly painful condition; so far as the general health, it makes them feel droopy, as they call it, and feel like things are going to drop out and backaches; they get nervous.

Such matters are necessarily uncertain. There was doubtless an honest difference of opinion among those skilled in such matters. There is and can be no standard for measuring the money value of bodily pain and mental anguish, even if the amount and duration of the same could be accurately determined. Much must be left to the good sense and judgment of the jury. All

verdicts in such cases are and necessarily must be more or less arbitrary. We see no evidence of passion or prejudice in this case. The verdict received the approval of the trial court. We do not feel that this court should interfere. The judgment is, therefore, affirmed.

*Robertson, P. J.,* concurs. *Farrington, J.,* dissents in separate opinion.

## DISSENTING OPINION.

FARRINGTON, J.—I am unable to concur in the majority opinion for the reason that I believe the verdict is the result of passion and prejudice.

The plaintiff is uncorroborated in describing the force of the derailment of the car, not only by all the eye-witnesses, but by the physical facts as well. Three witnesses, two of whom stand unimpeached, testified that the car was running at a slow rate of speed over a temporary track which had been laid to permit the street to be permanently paved, and their testimony is corroborated by the physical fact that when the derailment occurred, only the front truck left the rails, and that after the truck left the track the car did not move more than five feet and remained in an upright position with the rear truck still on the rails. The further physical evidence is that the jar occasioned by the front wheels dropping over one or two ties was not of sufficient force to break any of the car window-glasses or anything else connected with the car.

Plaintiff admits that as soon as another car came, she walked to it unassisted, and that owing to the condition of the street it was necessary for her to make two or three such transfers, some of which required her to walk as much as a block at a time; that she went on to the bank where she had started and had a check cashed, and from there went to her regular employment and worked Friday, Saturday and Sunday; that she laid off Monday and Tuesday but worked the remainder of the week at her position; that she never

made any complaint to any one connected with the defendant company for two or three weeks after the accident. She is not corroborated by her own physician when in her examination in chief she said that prior to this accident her health was good. Her physician, to whom she went the day after the accident, testified that he had been treating her for a considerable time prior to the accident for headaches, nervousness and rundown condition. Her testimony to the effect that she continued to grow worse from the time of the accident to the time of the trial is not corroborated by her statements that while she was in Arkansas staying with her father (several months after the accident occurred) she went nutting, boat riding, buggy riding, and riding on a speeder; that she sometimes walked to town, a distance of one mile; and, in the language of her Arkansas physician, "Sometimes she attended the usual festivities of the young people." Her testimony as to her general state of health subsequent to the accident shows that she was in practically the same condition as that for which her physician in Springfield testified he had been treating her for several months prior to the accident, and his testimony to this effect was given by him as a witness in her behalf.

The condition of plaintiff by reason of the derailment of the car—sought to be established by the evidence—was that there was such a derangement of the female organs from the traumatism that endometritis followed as a result. I deem it essential to quote rather extensively from the testimony of certain physicians who were witnesses in this case and whose testimony bears the stamp of fairness and frankness, two of whom were appointed by the trial judge to make an examination of the plaintiff before testifying, and to my mind this testimony indicates that at the time of the trial plaintiff's condition was far from being as serious as was considered by the jury as a result of the accident.

Plaintiff's physician, Doctor Dorrell, called as a witness in her behalf, testified in part as follows: "At the time as well as I could diagnose her case I attributed her headaches and nervous condition to an incomplete recovery of fever she had; that is, her blood had never gotten back to where it was before she had gotten sick. I do not base this diagnosis on her statements to me. I base it on looking at her. I can look at her and tell she has been sick. I could tell this before the accident. The accident hadn't changed her appearance but very little. She don't look quite as heavy. In fact there is very little difference in her between the first day I saw her and now. She looks more anemic than she did. There is no other difference in her appearance. That is all. No, I did not state a moment ago that I did not try to diagnose her case. I said I assumed her condition was a result of an incomplete recovery from some sickness. I couldn't tell what that sickness was. Different sickness would produce different results, and it is essential to discover the real cause. I attempted to discover the real cause, but I didn't go back to what caused the fever. She told me she had the fever. Don't remember if she said when. Don't remember if she gave the duration. And I assumed it had been a full recovery. But a failure to recover fully from biliousness would produce nervous headaches, and from typhoid might do it. By a failure to make a full recovery, I mean by this the patient's blood will never get back to the richness it was before sick, no matter what the sickness may have been. There is no such thing as complete recovery. I suppose I made other inquiries than about the fever she had. I asked her all kinds of questions, but I can't call them to mind now. I asked her whether she was constipated; whether she had any bladder trouble; whether she had any stomach trouble; if she slept well. In answer to these inquiries she stated to me that she had had the fever, had headaches, and that she couldn't sleep of-

nights unless off in a very quiet room away from noise. Said she was constipated, I think, and said she had a little bladder trouble, and bladder trouble is usually connected with the kidneys. I think it is anyway. These are the general lines that I asked her, and from her answers and the history of her case, I concluded that there was a nervous condition there and these headaches were due to her nervous condition and anemic condition and broken-down condition. I don't remember if she gave me the date of this typhoid fever. At the first time I think I took her heart action. I don't think I made a test of the urine. I am not sure about the examination of the urine, but I know I took the statement of the case as given to me by her. The last time I examined her was about a month or maybe two months ago. That is when I discovered or believed she was suffering from endometritis. Endometritis is an inflammation of the lining inside the womb all the way up, that is, of the womb proper. There is an acute and a chronic endometritis. No, I never heard of endometritis as a result of traumatism. Traumatism is not given in our textbooks that I have seen as a direct cause of endometritis.''

Doctor Roseberry, appointed by the court, testified in part as follows: ''The peritoneum was not involved when I made the examination with Doctor Ralston. That mass had disappeared at that time. This was my last examination. At the time of the first with Doctor Dorrell she had local peritonitis as I diagnosed it. Don't remember whether I discussed this with Doctor Dorrell at the time. In addition to hypertrophy of the womb I found circumscribed peritonitis, inflammation of the broad ligament, tube and ovary. Q. What will give endometritis besides a blow, besides a traumatism? A. I did not say a blow would produce it directly. Indirectly it may. Q. What else will produce it? A. Infection. There could not be endometritis without infection. A blow might produce a state of

traumatism and in that way lower the vitality of the parts involved and infection might follow. Usually, if the traumatism is severe enough, inflammation follows. I do not think there can be endometritis without infection and the reason I did not find the nature was because I made no microscopic examination. I repeat, there can be no endometritis without infection and I didn't say a blow would produce it. I repeat—infection is the only thing I know that will produce endometritis. The endometritis is the infection produced by a specific microscopic organism. Besides a blow, an enlargement of the uterus will produce would tend to produce anteversion of the womb and anything that would tend to enlarge the uterus will produce anteversion. And inflammation will tend to enlarge it. Weight of the uterus often produces misplacement. Miscarriage will not directly but we have misplacement following childbirth. Anything that will produce enlargement of the uterus and bring about increased weight has a tendency to weaken the ligaments and produce misplacement. Inflammation will produce enlargement and inflammation is produced by infection of some kind. Might follow childbirth, miscarriage, or an insertment or a blow. By insertment I mean insertion of foreign body. These are the usual causes, and traumatism comparatively speaking is very rare. If there was a blow sufficiently strong to cause this condition of the womb, the most likely thing would be acute inflammation. The time of development then of condition I describe would depend on the extent of the traumatism. The traumatism that Mr. Williams describes to me, I think would develop in a few days. Usually infection takes effect five to nine days after injury, but does not necessarily follow in such time. Nearly always you find some micro-organisms in inflammation. If an infection exists in some organ contiguous to the uterus, that could be communicated to the uterus and cause endometritis. Traumatism might

cause lower vitality of the parts inflamed and make a field for germs—pus germs. Pus germs might be thrown off by a perfectly healthy uterus without producing endometritis.''

Doctor Ralston testified as follows: ''My name is J. B. Ralston. I am a physician of thirty-two years' practice. I was appointed a commissioner by the court to examine Miss Patterson in this case. I made an examination, since I was appointed, with Doctor Roseberry within the last two or three weeks. We found everything normal, except there was a slight granulation in the cervix. The womb was slightly heavier than normal and slightly prolapsed. We found nothing wrong with the ovaries, nor anything wrong with the spinal column; no outside signs. We found a slight inflammation of the cervix and the womb was a little larger than normal. We would call this disease inflammation of the cervix, and the other we would call endometritis. There are two or three causes for endometritis. It is caused by something introduced from the outside, that is called inflammatory endometritis. It comes sometimes from a suppressed or irregular menstruation. Taking cold we call it, that produces endometritis. It is frequently caused by childbirth. In my experience and in my reading and observation I will state that I never came across a case of endometrities from traumatism, but suppose such a condition occurs. I will state that from the nature of the pelvic cavity and the severe guarding of the organs in the pelvic, and the sealing of those organs by the peritoneum, if a blow could reach those organs it would also reach the peritoneum and produce peritonitis. When we examined Miss Patterson we found a slight discharge from the cervix. There was no bloody discharge at that time; but I rubbed a piece of cotton there and there was slight blood. The condition we found her in is not particularly a painful condition. So far as the general health, it makes them feel droopy as they call it and feel like things are going

to drop out and backache. They get nervous. The condition that we found there was a slight anteversion and inflammation of the cervix, from my observation and experience is quite common among women.''

The only way in which I can account for the verdict in this case is that the record shows that the defendant company introduced a woman as a witness for the purpose of impeaching the statements of the plaintiff concerning the accident, and this witness on cross-examination was shown to bear an uneviable reputation for chastity; and that the defendant company, according to the record, sent a woman ''spy'' to Arkansas to keep defendant informed of the movements, actions and conduct of plaintiff while there. Believing as I do that these incidents in the trial must have prejudiced the minds of the jury against the defendant, I think justice can only be satisfactorily accomplished in this case by another trial. Where an appellate judge is convinced (as I am in this case) that a verdict is the result of passion and prejudice, it is his duty to at least give expression to his views. [Lehnick v. Street Ry. Co., 118 Mo. App. 611, 94 S. W. 996; Spohn v. Railway Co., 87 Mo. 74; Garrett v. Greenwell, 92 Mo. 120, 125, 4 S. W. 441; Whitsett v. Ransom, 79 Mo. 258, 260, 261; Brady v. Railroad, 206 Mo. 509, 540, 102 S. W. 978, 105 S. W. 1195; Caruth v. Richeson, 96 Mo. 186, 192, 9 S. W. 633.] I think the judgment should be reversed and the cause remanded for a new trial.